**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ERIK PRIME, Individually and on Behalf of All Others Similarly Situated,<br><br>                                  Plaintiff,<br><br>                    v.<br><br>DEXCOM, INC., KEVIN R. SAYER, JACOB S. LEACH, and JEREME M. SYLVAIN,<br><br>                                  Defendants. | **Case No.**<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Erik Prime ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding DexCom, Inc. ("DexCom" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired DexCom securities between July 26, 2024 and September 17, 2025, both dates inclusive (the "Class Period"), seeking

to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      DexCom is a medical device company primarily focused on the design, development, and commercialization of continuous glucose monitoring ("CGM") systems for the management of diabetes and metabolic health.  The Company's products include, *inter alia*, the Dexcom G6 ("G6") and Dexcom G7 ("G7") CGM systems, which DexCom launched in 2018 and 2023, respectively.

3.      The G7 is DexCom's flagship product and, accordingly, its commercial success is of paramount importance to both investors and Defendants.  At all relevant times, Defendants consistently touted the accuracy, reliability, and functionality of the G7, as well as their purported enhancements to the device and the ramping up of its manufacturing facilities.  As of the date of this Complaint's filing, DexCom continues to describe the G7 as its "most powerful [CGM] system" and "the most accurate CGM available."[1]

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) DexCom had made material design changes to the G6 and G7 unauthorized by the U.S. Food and Drug Administration (the "FDA"); (ii) the foregoing design changes rendered the G6 and G7 less reliable than their prior iterations, presenting a material health risk to users relying on those devices for accurate glucose readings; (iii) accordingly, Defendants' purported enhancements to the G7, as well as the device's reliability, accuracy, and functionality, were overstated; (iv) Defendants

---

[1] Home Page, DexCom, https://www.dexcom.com/ (last visited Oct. 27, 2025).

downplayed the true scope and severity of the issues and health risks posed by adulterated G7 devices; (v) all the foregoing subjected DexCom to an increased risk of heightened regulatory scrutiny and enforcement action, as well as significant legal, reputational, and financial harm; and (vi) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

5.      On March 7, 2025, DexCom disclosed in an SEC filing that, three days earlier, it had received a warning letter (the "Warning Letter") from the FDA related to concerns about manufacturing processes and quality management systems at certain of the Company's facilities.

6.      On this news, DexCom's stock price fell $7.12 per share, or 9.15%, to close at $70.72 per share on March 10, 2025, the next trading day.

7.      On March 25, 2025, the FDA published the Warning Letter on its website, revealing that DexCom had "adulterated" its G6 and G7 products by "modif[ying] the G6 and G7 sensors" without prior regulatory approval, thereby subjecting the devices to "larger inaccuracies" that "cause higher risks for users who rely on the sensors to dose insulin or make other diabetes treatment decisions."

8.      On this news, DexCom's stock price fell $3.19 per share, or 4.24%, over the following two trading sessions, to close at $72.13 per share on March 26, 2025.

9.      On September 8, 2025, equity research firm Oppenheimer issued a note downgrading DexCom's rating to "perform" from "outperform."  Oppenheimer also removed its $102.00 price target on the Company's stock.  Oppenheimer cited, *inter alia*, patient concern with the G7's poor accuracy, failed sensor insertions, abrupt stoppages, and other issues, noting that "field checks point to rising concerns about G7 accuracy/performance."

10.     On this news, DexCom's stock price fell $2.51 per share, or 3.12%, to close at $78.00 per share on September 8, 2025.

11.     Then, on September 18, 2025, Hunterbrook published a report addressing DexCom, entitled "Dexcom's Fatal Flaws". The Hunterbrook report revealed, *inter alia*, that issues and health risks posed by adulterated G7 devices were more severe and widespread than previously disclosed, citing FDA documents it had procured via a Freedom of Information Act ("FOIA") request, as well as various comments from doctors, patients and their families, and former DexCom employees. Specifically, the Hunterbrook report found that "G7 users have been hospitalized and died" following inaccurate glucose readings, linking these deadly incidents to adulterated G7 devices and Defendants' willingness to cut corners to meet margins.

12.     On this news, DexCom's stock price fell $8.99 per share, or 11.76%, over the following two trading sessions, to close at $67.45 per share on September 19, 2025.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  DexCom's common stock trades on the Nasdaq Global Select Market ("NASDAQ"), which is located in this District.

17.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

18.     Plaintiff, as set forth in the attached Certification, acquired DexCom securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

19.     Defendant DexCom is a Delaware corporation with principal executive offices located at 6340 Sequence Drive, San Diego, California 92121.  The Company's common stock trades in an efficient market on the NASDAQ under the ticker symbol "DXCM."

20.     Defendant Kevin R. Sayer ("Sayer") served as DexCom's Chief Executive Officer ("CEO") and Chairman of the Company's Board of Directors from before the start of the Class Period to September 14, 2025.  Defendant Sayer also served as DexCom's President from before the start of the Class Period to May 9, 2025.  During the Class Period, Defendant Sayer sold 65,857 shares of DexCom stock for total proceeds of approximately $5.19 million.

21.     Defendant Jacob S. Leach ("Leach") has served as DexCom's Chief Operating Officer at all relevant times.  Defendant Leach has also served as DexCom's President since May 9, 2025, as well as the Company's interim principal executive officer since September 14, 2025.  Defendant Leach is expected to start serving as DexCom's CEO on January 1, 2026.  During the

Class Period, Defendant Leach sold 18,200 shares of DexCom stock for total proceeds of approximately $1.33 million.

22.     Defendant Jereme M. Sylvain ("Sylvain") has served as DexCom's Executive Vice President and Chief Financial Officer at all relevant times.  During the Class Period, Defendant Sylvain sold 30,905 shares of DexCom stock for total proceeds of approximately $2.27 million.

23.     Defendants Sayer, Leach, and Sylvain are collectively referred to herein as the "Individual Defendants."

24.     The Individual Defendants possessed the power and authority to control the contents of DexCom's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of DexCom's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with DexCom, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

25.     DexCom and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26.     DexCom is a medical device company primarily focused on the design, development, and commercialization of CGM systems for the management of diabetes and

metabolic health. The Company's products include, *inter alia*, the G6 and G7 CGM systems, which DexCom launched in 2018 and 2023, respectively.

27. The G7 is DexCom's flagship product and, accordingly, its commercial success is of paramount importance to both investors and Defendants. At all relevant times, Defendants consistently touted the accuracy, reliability, and functionality of the G7, as well as their purported enhancements to the device and the ramping up of its manufacturing facilities. As of the date of this Complaint's filing, DexCom continues to describe the G7 as its "most powerful [CGM] system" and "the most accurate CGM available."

### **Materially False and Misleading Statements Issued During the Class Period**

28. The Class Period begins on July 26, 2024. On July 25, 2024, during after-market hours, DexCom hosted a conference call with investors and analysts to discuss its financial results for the second quarter ("Q2") of 2024. During that call, Defendant Sayer touted the Company's purported enhancements to the G7, stating, in relevant part[2]:

> ***We've built upon the performance of G7, making it even better.*** This includes a continuation of our monthly cadence of software updates, which included the second-quarter additions of medication logging and the ability to ingest activity data into our G7 app.
>
> We've introduced a stronger adhesive to support our customers into the summer months, and we expanded the G7 Bluetooth connectivity range by more than 65%. We advanced DexCom CGM leadership in the ID space with the launches of G7 integrations with Tandem's Mobi system and Insulet's Omnipod 5.

29. On the same call, Defendant Sylvain likewise touted DexCom's enhancements to the G7, as well as the Company's ramping up of the G7's manufacturing facilities, stating, in relevant part:

> We continue to see further migration of our customer base from G6 to G7 in the second quarter as we finalize new pump integrations and transition DexCom ONE to the G7 form factor.

---

[2] All emphases hereinafter are added unless otherwise indicated.

Between this ongoing customer transition and continued ramp up of our high-volume manufacturing facilities in Mesa and Malaysia, we are making steady progress towards our long-term cost targets.

30.     Also on July 25, 2024, during after-market hours, DexCom filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended June 30, 2024 (the "Q2 2024 10-Q").  The Q2 2024 10-Q represented, in relevant part, that DexCom's product development activities "are focused on improved performance and convenience" and "enabl[ing] intelligent insulin administration."

31.     Appended as exhibits to the Q2 2024 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Sayer and Sylvain certified, in relevant part, that the Q2 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

32.     On October 24, 2024, DexCom hosted a conference call with investors and analysts to discuss its financial results for the third quarter ("Q3") of 2024.  During his prepared remarks on the call, Defendant Sylvain stated, in relevant part:

> We've made significant progress in transitioning our installed base to the G7 form factor with new pump integrations . . . . This has enabled us to further scale our high-volume manufacturing facilities, which positions us well as we work towards our long-term cost targets.

33.     In response to an analyst's question on the call regarding DexCom's competitive advantages, Defendant Sayer stated, in relevant part:

> [W]e serve, several hundred thousand AID [automated insulin delivery] system users right now ***and the results of those AID systems with our partners have been incredibly good***. We work very closely with them on a regular basis to talk about the new features we're about to bring on board. ***We update our hardware and our app experience, our interfaces with them on a regular basis to enrich the***

***experiences of their customers, and we believe we do that better than anybody
else.*** Over time, our reputation in this market and one of the places we've been
always strong is in this Type 1 market because that has been where we have had
the largest market share advantage for a very long time and ***we intend to maintain
that through the higher quality of our product*** . . . . ***The accuracy of DexCom is
tried and true and proven to these patients.*** I've been to several -- it's kind of
diabetes fundraiser season. I've been to a few fundraiser things that I've seen
numerous Omnipod and Tandem users, who are now using G7, certainly the
Tandem ones and the Omnipods were starting to switch. Their belief in DexCom
and our sensors is incredibly heartwarming. And it's very important to see that is a
great customer base for us. ***And we'll continue to serve it the same way we always
have.***

34.    Also on October 24, 2024, DexCom filed a quarterly report on Form 10-Q with the

SEC, reporting the Company's financial and operating results for its Q3 ended September 30, 2024

(the "Q3 2024 10-Q"). The Q3 2024 10-Q continued to represent, in relevant part, that DexCom's

product development activities "are focused on improved performance and convenience" and

"enabl[ing] intelligent insulin administration."

35.    Appended as exhibits to the Q3 2024 10-Q were substantively the same SOX

certifications as referenced in ¶ 31, *supra*, signed by Defendants Sayer and Sylvain.

36.    On January 13, 2025, DexCom issued a press release reporting its preliminary,

unaudited fourth quarter ("Q4") and fiscal year ("FY") 2024 financial results. The press release

quoted Defendant Sayer as stating:

Dexcom made key strategic investments in 2024 that steadily progressed
throughout the year, leaving us well positioned to capitalize on our growth
opportunity ahead . . . . We plan to build on these investments in 2025 ***by further
enhancing our differentiated product portfolio*** and advocating for greater CGM
access globally.

37.    On February 13, 2025, DexCom hosted a conference call with investors and

analysts to discuss its Q4 and FY 2024 results. During the call, Defendant Leach stated, in relevant

part:

*[W]e are always striving to enhance the accuracy and reliability of our sensors. G7 is the most accurate sensor available*, but there's still opportunities to enhance this technology and make it more accurate, more reliable for broader group of users.

And so, even within the G7 platform, *we're still working to further enhance the accuracy of that system*.

38.     On February 18, 2025, DexCom filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and FY ended December 31, 2024 (the "2024 10-K"). The 2024 10-K touted the G7 as "the most accurate CGM cleared by the FDA" with, *inter alia*, a "[p]ersonalized alert schedule [that] immediately warns the user of pending dangerous high and low blood sugar levels[,]" a "[n]ew feature [that] allows for more accurate glucose readings[,]"and an "[a]lert feature intended to predict hypoglycemia before it hits to help avoid dangerous low blood sugar events."

39.     The 2024 10-K also represented that the G7 "[a]utomatically sends glucose readings to a Dexcom receiver or compatible display device every five minutes" and "is generally consistent with our prior generation CGM systems in its technical capabilities and its indications."

40.     Appended as exhibits to the 2024 10-K were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by Defendants Sayer and Sylvain.

41.     The statements referenced in ¶¶ 28-40 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) DexCom had made material design changes to the G6 and G7 unauthorized by the FDA; (ii) the foregoing design changes rendered the G6 and G7 less reliable than their prior iterations, presenting a material health risk to users relying on those devices for accurate glucose readings; (iii) accordingly, Defendants' purported enhancements to the G7, as well as the device's reliability,

accuracy, and functionality, were overstated; (iv) Defendants downplayed the true scope and severity of the issues and health risks posed by adulterated G7 devices; (v) all the foregoing subjected DexCom to an increased risk of heightened regulatory scrutiny and enforcement action, as well as significant legal, reputational, and financial harm; and (vi) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

## The Truth Begins to Emerge

42.    On March 7, 2025, during after market-hours, DexCom filed a current report on Form 8-K with the SEC, disclosing the Warning Letter that it had received three days earlier from FDA, which related to concerns about manufacturing processes and quality management systems at certain of the Company's manufacturing facilities.  Specifically, the current report stated, in relevant part:

> On March 4, 2025, the Company received a warning letter from the [FDA] following inspections of the Company's facilities in San Diego, California, and Mesa, Arizona. In the warning letter, the FDA cited deficiencies in the response letters sent by the Company to the FDA following the Form 483, List of Investigational Observations (the "Form 483"), which was delivered to the Company in connection with the inspection of the San Diego facility that occurred from October 21, 2024 through November 7, 2024, and the inspection of the Mesa, Arizona facility that occurred from June 10, 2024 through June 14, 2024.

> The warning letter describes observed non-conformities in manufacturing processes and quality management system. The warning letter does not restrict the Company's ability to produce, market, manufacture or distribute products, require recall of any products, nor restrict the Company's ability to seek FDA 510(k) clearance of new products.

> The Company takes the matters identified in the warning letter seriously, has already submitted several responses to the Form 483 and is in the process of preparing a written response to the warning letter. The Company intends to continue to undertake certain corrections and corrective actions and will also continue to provide regular updates to the FDA in response to the Form 483. The Company cannot, however, give any assurances that the FDA will be satisfied with its response or as to the expected date of the resolution of the matters included in the warning letter. Until the issues cited in the warning letter are resolved to the FDA's

satisfaction, additional legal or regulatory action may be taken without further notice.

Notably, the foregoing disclosures made no mention of DexCom's G6 and G7 devices, much less that the FDA had taken issue with the Company's material design changes to those devices.

43.    On this news, DexCom's stock price fell $7.12 per share, or 9.15%, to close at $70.72 per share on March 10, 2025, the next trading day.

44.    Then, on March 25, 2025, during pre-market hours, the FDA published the Warning Letter on its website, revealing that DexCom had "adulterated" its G6 and G7 products by "modif[ying] the G6 and G7 sensors" without prior regulatory approval, stating, *inter alia*:

> Our inspection revealed that ***the G6 and G7 [CGM] Systems are adulterated*** . . . because your firm does not have approved applications for premarket approval (PMA) in effect . . . or approved applications for an investigational device exemption . . . . The devices are also misbranded . . . because your firm introduced or delivered for introduction into interstate commerce for commercial distribution these devices ***with major changes or modifications to the devices without submitting a new premarket notification to FDA, as required*** . . . . ***Specifically, your firm modified the G6 and G7 sensors*** by replacing the [redacted] with [redacted] used in the [redacted] . . . . [Y]our December 3, 2024, response includes the Sensor Level Performance Equivalency of [redacted] and [redacted], ***which shows a significant difference in the standard deviation (SD) of glucose sensitivities between sensors*** built with [redacted] and [redacted]. This difference in SD indicates greater clinical performance variation for sensors with [redacted]. ***The larger inaccuracies in [redacted]-coated sensors cause higher risks for users who rely on the sensors to dose insulin or make other diabetes treatment decisions.*** Therefore, we do not agree your firm has shown equivalency between [redacted] and [redacted] to justify that such a change does not require a new premarket submission. ***The variability differences could significantly affect the safety or effectiveness of the device[.]***

45.    On this news, DexCom's stock price fell $3.19 per share, or 4.24%, over the following two trading sessions, to close at $72.13 per share on March 26, 2025.

46.    Despite the foregoing declines in DexCom's stock price, the Company's securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions concerning, *inter alia*, the G7's

reliability, accuracy, and functionality, as well as the true scope and severity of the issues and

health risks posed by adulterated G7 devices.

47.    For example, on May 1, 2025, DexCom hosted a conference call with investors and

analysts to discuss its financial results for the first quarter ("Q1") of 2025.  Defendant Sayer

addressed the FDA's Warning Letter on the call, stating, in relevant part:

> This letter was related to observations made by the agency following the
> inspections of our San Diego and Mesa facilities during 2024. We take any FDA
> recommendations very seriously. So our team immediately began instituting
> corrective actions to address these observations. While we were disappointed to
> receive a warning letter, I'm incredibly proud of how our teams have rallied
> together with a thorough review and response, and we look forward to working
> together with the FDA to further strengthen our systems and processes.
>
> As one example of our ongoing collaboration with the agency, we were excited to
> recently announce FDA clearance for our 15 Day Dexcom G7 System. This marks
> another innovation milestone for our company as our 15 Day product advances both
> wear time and accuracy levels for G7 with performance data demonstrating an
> MARD of 8.0%, this sets a new bar in the industry in terms of sensor accuracy.

48.    In response to an analyst's inquiry regarding potential negative consequences

stemming from the FDA's Warning Letter and DexCom's resolution of the agency's concerns,

Defendant Leach stated, *inter alia*:

> [W]e are basically working to implement a number of process controls. We already
> did quite a bit after the FDA came in and audited . . . . The warning letter doesn't
> restrict submissions and approvals of new technologies, devices and/or it doesn't
> restrict distribution at all. Just basically, there's a number of things we have to
> continue to work with the FDA to ensure we address all their concerns. So it's a big
> focus for us. And so we've got a number of dedicated resources ensuring that, that
> is done, but it doesn't restrict us at all.

49.    Also on May 1, 2025, DexCom filed a quarterly report on Form 10-Q with the SEC,

reporting the Company's financial and operating results for its Q1 ended March 31, 2025 (the "Q1

2025 10-Q").  The Q1 2025 10-Q continued to represent, in relevant part, that DexCom's product

development activities "are focused on improved performance and convenience" and "enabl[ing]

intelligent insulin administration."

50.    The Q1 2025 10-Q also purported to warn of risks that "may" or "could" materialize

from the deficiencies identified in the FDA's Warning Letter, while simultaneously downplaying

the true scope and severity of the same, stating, *inter alia*:

> In the warning letter, the FDA cited deficiencies in the response letters sent by us
> to the FDA following the Form 483, List of Investigational Observations that was
> delivered to us in connection with the inspection of our San Diego facility that
> occurred from October 2024 through November 2024, and the inspection of our
> Mesa, Arizona facility that occurred in June 2024. The warning letter describes
> observed non-conformities in manufacturing processes and our quality
> management system. We take the matters identified in the warning letter seriously
> and have already submitted responses to the Form 483 and to the FDA warning
> letter.

* * *

> The potential effect of the warning letter . . . can in some cases be difficult to
> quantify and ***could*** harm our reputation and cause our product sales and profitability
> to suffer. In addition, we believe events that ***could*** be classified as reportable events
> pursuant to MDR [Medical Device Reporting] regulations are generally
> underreported by physicians and users, and any underlying problems ***could*** be of a
> larger magnitude than suggested by the number or types of MDRs filed by us.
> Furthermore, our key component suppliers ***may*** not currently be or ***may*** not
> continue to be in compliance with applicable regulatory requirements.

* * *

> Later discovery of previously unknown problems with our products, including
> software bugs, unanticipated adverse events or adverse events of unanticipated
> severity or frequency, manufacturing problems, or failure to comply with
> regulatory requirements such as the QSR [Quality System Regulation], MDR
> reporting, or other post-market requirements ***may*** result in restrictions on such
> products or manufacturing processes, withdrawal of the products from the market,
> voluntary or mandatory recalls (through corrections or removals), fines, suspension
> of regulatory approvals, product seizures, injunctions, the imposition of civil or
> criminal penalties, or criminal prosecution.

(Emphases added.)  Plainly, the foregoing risk warnings were generic, catch-all provisions that

were not tailored to Defendants' actual known risks regarding the deficiencies identified in the

14

Warning Letter, much less issues specific to adulterated G7 devices, such as patient injury or death resulting from those devices' inability to reliably provide accurate glucose readings.

51.     Appended as exhibits to the Q1 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by Defendants Sayer and Sylvain.

52.     On July 30, 2025, DexCom hosted a conference call with investors and analysts to discuss its financial results for Q2 2025.  During the call, Defendant Leach stated, *inter alia*, that "we need to **continue** to ensure that we are building sensors that are both ***reliable, accurate*** and continue to push that boundary because it's so important for the users."

53.     On the same call, in discussing DexCom's progress in addressing the FDA's concerns in the Warning Letter, Defendant Leach stated, in relevant part:

> Things have been going really well with the FDA. We responded rapidly to the warning letter and their concerns. And we've been giving them periodic updates. We've made quite a bit of updates to our processes and documentation, addressing much of what the FDA's concerns were. And so we still have work to do there, but we've been making fantastic progress there.

54.     Also on July 30, 2025, DexCom filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended June 30, 2025 (the "Q2 2025 10-Q").  The Q2 2025 10-Q continued to represent, in relevant part, that DexCom's product development activities "are focused on improved performance and convenience" and "enabl[ing] intelligent insulin administration."

55.     The Q2 2025 10-Q also contained substantively the same generic, boilerplate risk warnings as referenced in ¶ 50, *supra*, which purported to warn of risks "may" or "could" materialize from the deficiencies identified in the FDA's Warning Letter, while simultaneously downplaying the true scope and severity of the same.  These risk warnings were not tailored to Defendants' actual known risks regarding the deficiencies identified in the Warning Letter, much

less issues specific to adulterated G7 devices, such as patient injury or death resulting from those devices' inability to reliably provide accurate glucose readings.

56.     Appended as exhibits to the Q2 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by Defendants Sayer and Sylvain.

57.     The statements referenced in ¶¶ 42 and 47-56 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants' purported enhancements to the G7, as well as the device's reliability, accuracy, and functionality, were overstated; (ii) Defendants downplayed the true scope and severity of the issues and health risks posed by adulterated G7 devices; (iii) all the foregoing subjected DexCom to, *inter alia*, significant legal, reputational, and financial harm; and (iv) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

### The Truth Continues to Emerge

58.     On September 8, 2025, during pre-market hours, Oppenheimer issued a note downgrading DexCom's rating to "perform" from "outperform."  Oppenheimer also removed its $102.00 price target on the Company's stock.  Oppenheimer cited, *inter alia*, patient concern with the G7's poor accuracy, failed sensor insertions, abrupt stoppages, and other issues, noting that "field checks point to rising concerns about G7 accuracy/performance."

59.     On this news, DexCom's stock price fell $2.51 per share, or 3.12%, to close at $78.00 per share on September 8, 2025.

60.     Then, on September 18, 2025, during pre-market hours, Hunterbrook published a report addressing DexCom, entitled "Dexcom's Fatal Flaws".  The Hunterbrook report revealed,

among other things, that issues and health risks posed by adulterated G7 devices were more severe

and widespread than previously disclosed, stating, *inter alia*:

> **G7 users have been hospitalized and died:** Billy Sosbe lost his life in June after his G7 gave him incorrect glucose readings. Diana Bates Knight's six-year-old daughter was rushed to the ER when her G7 misread her blood sugar by hundreds of points. Bob Hawkinson passed out behind the wheel when his G7 failed to alert him to dangerously low blood sugar. These aren't isolated incidents. More than a dozen other G7 users interviewed by Hunterbrook said they felt betrayed by a technology that had once been life-changing. According to a law firm investigating the G7 following a recall and FDA warning letter, at least 60 people claim to have been hospitalized and multiple others allege death connected to G7 issues. A Facebook group for G7 problems exploded to more than 58,000 members in just over one year.

(Emphasis in original.)

61.     The Hunterbrook report found that DexCom had prioritized its margins over safety,

citing comments from the Company's former employees, stating, *inter alia*:

> **Dexcom staff say corporate culture put margins over safety, eroding trust in the brand:** Former employees described safety concerns in a rush to launch the G7 to compete with Abbott. Leadership of the team responsible for a component flagged by the FDA had inadequate credentials with a "very low" technical level according to a former scientist. The former senior director of manufacturing at the company's critical Mesa, Arizona, plant said "Dexcom definitely dropped the ball" and "the arrogance of Dexcom is really what needed to be reset." Another former executive said Dexcom compromised the product trying to "hold on to large revenue margins." Multiple former employees told Hunterbrook the G7's problems are symptomatic of a deeper struggle: an innovative company floundering to keep alive a growth story demanded by Wall Street amid a series of headwinds.

(Emphasis in original.)

62.     The Hunterbrook report also found, *inter alia*, that doctors were becoming

increasingly concerned with the G7's safety, prompting some to stop recommending the device

altogether:

> **Doctors raise alarms:** Hunterbrook spoke with endocrinologists across the country. While all reported imperfections with [CGMs] generally, several highlighted issues with the G7 in particular. They noted disproportionate sensor inaccuracies, repeated device failures, connectivity issues, and problems with the

adhesive. Two said when they spoke with Dexcom representatives, the company expressed surprise or "didn't know anything," a phenomenon one doctor said was tantamount to "gaslighting." Others told Hunterbrook they have stopped putting patients on the G7 altogether.

(Emphasis in original.)

63.    In addition, the Hunterbrook report expanded on the disclosures in the FDA's Warning Letter, citing documents it had procured from the agency via a FOIA request, stating, *inter alia*:

> **Dexcom incorporated materials into the G7 that it knew were worse by "every accuracy metric," according to FDA documents:** In December 2023, Dexcom switched the coating of G7 sensors from an outsourced material to an in-house formulation. FDA inspection documents obtained by Hunterbrook show Dexcom's internal studies demonstrated the new material could lead to "differences in accuracy" that may affect insulin dosing. Despite its own tests failing to show equivalence with the original component, Dexcom sold the product anyway — without proper regulatory clearance. The FDA cited Dexcom with a violation for making this unauthorized change to a "critical raw ingredient" and declared the devices "adulterated." Complaints about the G7's accuracy were far greater for devices manufactured after Dexcom changed the material in December 2023, according to Hunterbrook's analysis of FDA data.

(Emphasis in original.)

64.    Following Hunterbrook's publication of its report, DexCom's stock price fell $8.99 per share, or 11.76%, over the following two trading sessions, to close at $67.45 per share on September 19, 2025.

65.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## Regulation S-K Items 105 and 303

66.    Throughout the Class Period, DexCom's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and

regulations.  Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required DexCom to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered."  Defendants failed to disclose, *inter alia*, the true reliability, accuracy, and functionality of the G7, as well as the true scope and severity of the issues and health risks posed by adulterated G7 devices.  Defendants' failure to disclose the foregoing issues violated Item 105 because these issues represented material factors that made an investment in the Company speculative or risky.

67.     For similar reasons, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required DexCom to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failure to disclose, *inter alia*, the issues described *supra* at ¶ 66 violated Item 303 because these issues represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

### SCIENTER ALLEGATIONS

68.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for DexCom's securities, Defendant Sayer enriched himself by approximately $5.19 million by selling 65,857 shares of DexCom common stock, Defendant Leach enriched himself by approximately $1.33 million by selling 18,200 shares of DexCom common stock, and Defendant Sylvain enriched himself by approximately $2.27 million by selling 30,905 shares of DexCom common stock.

69.     Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.  Indeed, at all relevant times, Defendants were highly focused on the G7—the Company's flagship product.  Defendants were also highly focused on addressing the FDA's concerns identified in the Warning Letter, as they attested to on multiple conference calls with investors and analysts.  Such concerns directly related to, *inter alia*, the G7 and its ability to reliably provide accurate glucose readings following the Company's material design changes to that device.  Accordingly, Defendants were intimately aware of the false and misleading nature of their Class Period statements, as alleged herein, when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired DexCom securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

71.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DexCom securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or

thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by DexCom or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

72.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

73.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

74.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of DexCom;

- whether the Individual Defendants caused DexCom to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of DexCom securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

75.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

76.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- DexCom securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold DexCom securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

77.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

78.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

79.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

80.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

81.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of DexCom securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire DexCom securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

82.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for DexCom securities.  Such reports, filings, releases and statements were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about DexCom's finances and business prospects.

83.     By virtue of their positions at DexCom, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

84.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of DexCom, the Individual Defendants had knowledge of the details of DexCom's internal affairs.

85.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of DexCom.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to DexCom's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of DexCom securities was artificially inflated throughout the Class Period.  In

ignorance of the adverse facts concerning DexCom's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired DexCom securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

86.    During the Class Period, DexCom securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of DexCom securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of DexCom securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of DexCom securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

87.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

88.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

89.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

90.    During the Class Period, the Individual Defendants participated in the operation and management of DexCom, and conducted and participated, directly and indirectly, in the conduct of DexCom's business affairs.  Because of their senior positions, they knew the adverse non-public information about DexCom's misstatement of income and expenses and false financial statements.

91.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to DexCom's financial condition and results of operations, and to correct promptly any public statements issued by DexCom which had become materially false or misleading.

92.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which DexCom disseminated in the marketplace during the Class Period concerning DexCom's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause DexCom to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of DexCom within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of DexCom securities.

93.     Each of the Individual Defendants, therefore, acted as a controlling person of DexCom.  By reason of their senior management positions and/or being directors of DexCom, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, DexCom to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of DexCom and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

94.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by DexCom.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 27, 2025                               Respectfully submitted,

                                                      POMERANTZ LLP

                                                      */s/ Jeremy A. Lieberman*
                                                      Jeremy A. Lieberman
                                                      J. Alexander Hood II

James M. LoPiano
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

*Attorneys for Plaintiff*